IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CURTIS M. JOHN-CHARLES,

        Petitioner,               No. CIV S-05-0175 MCE GGH P

     vs.

STATE OF CALIFORNIA, et al.,

        Respondents.        FINDINGS AND RECOMMENDATIONS

_____/

I.  Introduction

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2002 conviction for two counts of home invasion robbery in concert with others, assault with a firearm, receipt of stolen property and possession of a firearm as a felon.  Petitioner was also originally convicted of personally using a handgun in connection with the home-invasion robberies.  On appeal, his convictions for personally using a handgun were reversed and he was resentenced to 18 years.

        This action is proceeding on the amended petition filed October 26, 2006, and the supplemental petition filed December 12, 2007.  The October 26, 2006, amended petition raises claims challenging the use of petitioner's prior juvenile conviction as a strike to increase his sentence.  In particular, petitioner claims that use of the juvenile conviction as a strike violated

1

1   Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), the juvenile conviction is invalid

2   because the juvenile court failed to state on the record what factors it considered in aggravation

3   as well as the reasons for confining petitioner in the California Youth Authority for the

4   maximum period allowable, and his juvenile conviction should not have been used as a strike

5   because it should have been reduced to a misdemeanor.

6          The December 12, 2007, supplemental petition raises the following new claims:

7   1) the trial court denied petitioner's Sixth Amendment right to counsel by refusing to permit him

8   to withdraw his Faretta waiver; 2) the trial court violated the equal protection clause when it

9   failed to impose concurrent sentences; 3) the trial court violated the due process clause by

10  denying petitioner's motion for a new trial; 4) juror misconduct; 5) ineffective assistance of

11  appellate counsel and counsel who represented petitioner at sentencing; 6) jury instruction error;

12  7) cumulative error.

13         After carefully considering the record, the court recommends that the petition be

14  denied.

15  II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

16         The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

17  petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

18  138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

19  AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

20  standards of review to be used by a federal habeas court in assessing a state court's adjudication

21  of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

22  (9th Cir. 1997).

23         In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

24  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

25  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

26  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

1   "unreasonable application of" that law. Id. at 1519.  "Contrary to" clearly established law applies

2   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

3   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

4   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

5          "Unreasonable application" of established law, on the other hand, applies to

6   mixed questions of law and fact, that is, the application of law to fact where there are no factually

7   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

8   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

9   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

10  deference is not blindly automatic, "the most important point is that an *unreasonable* application

11  of federal law is different from an incorrect application of law....[A] federal habeas court may not

12  issue the writ simply because that court concludes in its independent judgment that the relevant

13  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

14  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

15  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

16  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

17  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

18         The state courts need not have cited to federal authority, or even have indicated

19  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

20  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

21  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

22  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

23  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

24  established Supreme Court authority reviewed must be a pronouncement on constitutional

25  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

26  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

1    However, where the state courts have not addressed the constitutional issue in

2   dispute in any reasoned opinion, the federal court will independently review the record in

3   adjudication of that issue. "Independent review of the record is not de novo review of the

4   constitutional issue, but rather, the only method by which we can determine whether a silent state

5   court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

6   2003).

7    When reviewing a state court's summary denial of a claim, the court "looks

8   through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234

9   F.3d 1072, 1079 n. 2 (9th Cir. 2000).

10    In order to determine the proper standard of review to apply to each claim, the

11  following background information is necessary. In his direct appeal petitioner raised two claims:

12  1) denial of the right to counsel; and 2) use of the prior juvenile conviction as a strike violated

13  Apprendi, supra. The California Court of Appeal issued a reasoned decision denying these

14  claims. Respondent's Lodged Document 4. The California Supreme Court denied the petition

15  for review without comment or citation. Id., 7. However, Justice Kennard was of the opinion

16  that the petition should be granted. Id. Accordingly, the court considers whether the denial of

17  these claims by the California Court of Appeal was an unreasonable application of clearly

18  established Supreme Court authority.

19    On May 5, 2004, petitioner filed a habeas corpus petition in the Sacramento

20  County Superior Court raising the following claims: 1) the trial court erred when it failed to

21  impose concurrent sentences; 2) ineffective assistance of counsel at sentencing; 3) ineffective

22  assistance of appellate counsel. Id., 8. On June 17, 2004, the Superior Court issued a reasoned

23  opinion denying these claims on the merits. Id., 9.

24    On July 8, 2004, petitioner filed a second habeas corpus petition in Sacramento

25  County Superior Court. Id., 12. This petition raised claims alleging 1) ineffective assistance of

26  counsel and appellate counsel; 2) juror misconduct; 3) the trial court erred in denying petitioner's

4

new trial motion.  Id., 12.  On August 25, 2004, the Superior Court issued an opinion denying

the petition as successive.  The Superior Court also denied the juror misconduct claim on the

merits.  Id., 13.  The Superior Court found that petitioner's claim alleging that the trial court

improperly denied his new trial motion should have been raised on appeal, citing In re Dixon, 41

Cal.2d 756, 759 (1953).  Id.  The court denied the ineffective assistance of trial and appellate

counsel claims on the merits.  Id.

On August 17, 2004, petitioner filed a third habeas corpus petition in Sacramento

County Superior Court.  Id., 14.  This petition raised claims alleging that the trial court failed to

consider his ability to pay in setting the amount of the restitution fine and that if this error was

waived, then trial counsel was ineffective for failing to object.  Id.  On September 26, 2005, the

Superior Court denied this petition as untimely, successive and on the merits.  Id., 15.[1]

On July 19, 2004, petitioner filed a habeas corpus petition in the California Court

of Appeal.  Id., 16.  This petition raised the following claims: 1) ineffective assistance of trial and

appellate counsel; 2) the trial court erred in failing to impose concurrent sentences.  Id.  On July

22, 2004, the California Court of Appeal denied this petition without comment or citation.  Id.,

17.

On January 19, 2005, petitioner filed a second habeas petition in the California

Court of Appeal.  Id., 18.  This petition raised the following claims: 1) ineffective assistance of

trial and appellate counsel; 2) juror misconduct; 3) the trial court erred in denying his motion for

a new trial.  Id.  On January 27, 2005, the California Court of Appeal denied this petition without

comment or citation.  Id., 19.

On October 27, 2005, petitioner filed a third habeas petition in the California

Court of Appeal.  Id., 20.  In this petition, petitioner requested that the restitution order be

---

[1] In March 2006 petitioner filed a petition for writ of mandate in the Sacramento County
Superior Court.  On May 31, 2006, the Superior Court denied the petition for lack of jurisdiction.
This petition is not relevant to determining the standard of review.

1  vacated.  Id.  On November 10, 2005, the California Court of Appeal denied this petition without

2  comment or citation.  Id., 21.

3          On June 12, 2006, petitioner filed a petition for a writ of mandate in the California

4  Court of Appeal.  Id., 22.  On June 22, 2006, the California Court of Appeal denied this petition

5  without comment or citation.  Id., 23.  On August 21, 2006, petitioner filed a petition for a writ of

6  error coram vobis in the California Court of Appeal.  Id., 24.  On August 31, 2006, the California

7  Court of Appeal denied this petition without comment or citation.  Id., 25.

8          On July 3, 2006, petitioner filed a petition for review of the denial of his petition

9  for writ of mandate in the California Supreme Court.  Id., 26.  On August 16, 2006, the

10  California Supreme Court denied this petition without comment or citation.  Id., 27.

11          On September 11, 2006, petitioner filed a petition for review of the denial of his

12  petition for a writ of error coram vobis in the California Supreme Court.  Id., 28.  On October 18,

13  2006, the California Supreme Court denied this petition without comment or citation.  Id., 29.

14          In the petitions for review filed in the California Supreme Court, petitioner raised

15  the same claims he raises in the instant petition challenging the use of his juvenile conviction as a

16  strike.  Id, 26, 28.  Because no state court issued a reasoned decision denying these claims, this

17  court independently reviews these claims to determine whether their denial by the California

18  Supreme Court was an unreasonable application of clearly established Supreme Court authority.[2]

19          This court agrees with respondent that petitioner's remaining claims (trial court

20  erred in imposing concurrent sentences and denying new trial motion, juror misconduct,

21  ineffective assistance of trial and appellate counsel, and jury instruction error) are unexhausted

22  because they were not presented to the California Supreme Court.  However, because these

23  claims are without merit they may be considered despite lack of exhaustion.  28 U.S.C. §

24

25          [2]  Respondent does not argue that the claims raised in the petitions for review were not
   raised in a context in which the California Supreme Court could not consider their merits.  For
26  that reason, the court will not consider this issue and deems the claims exhausted.

2254(b)(2).  The court reviews these claims de novo.  See Lewis v. Mayle, 391 F.3d 989, 996

(9th Cir. 2004); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

III.  Factual Background

        The opinion of the California Court of Appeal contains a factual summary.  After

independently reviewing the record, the court finds this summary to be accurate and adopts it

below.

        FACTUAL AND PROCEDURAL BACKGROUND

        Robbery victim Michelle Coleman (Michelle) lived with her sister Eva Jacobs (Eva), their young children, and an infant cousin in a duplex on Libra Avenue in Sacramento County.FN3

                FN3. For clarity and ease of expression, we shall refer to the witnesses by their first names. No disrespect is intended.

        On the evening of the robberies, Michelle and Eva went to a nightclub with Eva's boyfriend, Emory Jackson (Emory). Michelle's brother-in-law, Joe Johnson (Joe), stayed at home with the children.

        At the nightclub, Eva saw codefendant Richard Ward, whom she knew, and the two had a friendly exchange.

        After the club closed, Eva and her boyfriend Emory drove home to the duplex on surface streets. At a stop sign, a small, dark-colored car drew alongside them. Someone from that car fired a gun toward Eva's car, and then sped off, followed closely by a second car, an older model, white Cadillac. Eva and Emory then returned to Eva's house, parking her car outside. A bullet hole was later found in the car's rear passenger door.

        Around that time, Michelle returned to the duplex, accompanied by Mark Bluster (Mark), with whom she had been drinking at the nightclub. The two sat talking in Mark's car, in front of the house.

        After she was inside the duplex, Eva heard a car pull up, but saw no car lights. Emory looked out the window and told Eva that it was the "guys" who had shot at them earlier. Eva accordingly ran toward the rear bedroom where Joe and the children were sleeping, and yelled to him to wake up and get out of the house. She then climbed out a back window with her daughter and Emory. They hid in a neighbor's shed.

        As Michelle sat with Mark outside the duplex, she saw a newer model silver or gray car with no rear license plate light circling "in the court." Michelle "had a bad feeling about the way the car came in the court because there was no back license plate light." Suddenly, Michelle heard a lot of shouting, and she and Mark were physically pulled from their car. Michelle's coat was pulled over her head so

that she could see nothing. Mark saw a gun or guns pointed at him as he was pulled from the car, but thereafter only felt a gun. Michelle was "pistol whipped" on the back of her head and moved toward the front door of the duplex, where one of her assailants demanded that she open the door. After Michelle failed to comply, someone kicked the door in. Once inside the house, Mark was made to lay face down and was hit in the head; someone took his jewelry, cell phone, and pager.

Michelle did not see her assailants, did not see what type of clothing they were wearing, and did not actually see the car in which the assailants had arrived. Mark noticed that some of the robbers were wearing gloves, but did not see their faces because they all wore masks; and he could not describe their height, except to say that no one was taller than his 6 feet, 5 inches. In sum, he said that he "didn't see nothing because my face was bend [ sic ] down." Both Michelle and Mark testified that they heard three or four different voices during the attack, and Mark testified at trial that there were four or five assailants.

Inside the duplex, Joe (Michelle's brother-in-law and babysitter) had been awakened by Eva's yelling and emerged from the rear bedroom. He saw four men in the hallway, all wearing black masks, jackets, long pants, and gloves. He could not see their faces or discern their race.

Joe noticed that two of the men had handguns. One of the robbers stuck Joe in the neck with what Joe thought was a black Beretta or other nine-millimeter handgun, and asked who else was in the house, demanding money, jewelry, and the keys to the car parked out front. He then directed Joe to lay down as others searched the house. While Joe was on the floor, he was hit in the back of the head by one of the robbers, and someone stepped on him.

When the assailants had gone, Michelle saw that the house had been "demolished," the stereo was gone, and $400 was missing from her dresser drawer. Michelle had a raised lump on the back of her head and a bruise on the back of her neck; Mark had a bump on the back of his head; and Joe had a bruise on the back of his head and a rash on his neck where the gun had made contact with him.

From their hiding place in the neighbor's shed, Eva and her boyfriend Emory used her cell phone to call the police, reported that there were intruders in the house, and described the shooting earlier that night.

A nearby sheriff's deputy, Kristina Albright, heard a radio report of the robbery and learned that the suspects may have used a newer, silver Cadillac. Shortly thereafter, she saw a newer, silver Cadillac emerge from the Libra Avenue cul-de-sac and followed it.

Other officers responded to the deputy's dispatch and also began following the Cadillac. Sergeant Robert Rinelli saw that two people were in the car. The driver was a light-skinned black man; the passenger was a darker-skinned black man wearing a dark knit ski cap and dark clothing. When Deputy Albright activated her car lights, the Cadillac accelerated briefly and then stopped abruptly. The passenger opened the car door and fled through the adjacent yards; Rinelli chased

him. At trial, Sergeant Rinelli identified defendant as the fleeing passenger.

Codefendant Ward was the driver of the Cadillac. When the car stopped, he was wearing black shorts, a red and black coat, and a white shirt.

A few minutes later, defendant was found by officers hiding in a trash can behind a nearby house. With him in the trash can were a black jacket, a black sweat shirt, a black stocking cap, and one black glove, which an officer testified were the clothes that defendant had been wearing when he ran from the Cadillac.

A nine-millimeter Beretta pistol with live ammunition was found on the sidewalk five to 10 feet away from the Cadillac's open front-passenger door.

When Michelle saw the car in which Ward and the defendant had been riding, she told police that she was "100 percent positive" that it was the same car that the assailants had been driving. Mark was also taken to view the car; he told police that he noticed the car in the cul-de-sac once, 15 or 20 minutes before the assault.

Inside the Cadillac were various items that Eva identified as belonging to her, including stereo equipment and a duffel bag. Ward had $400 wadded up in his pants pocket, outside his wallet. None of Mark's property was found in the car.

Defendant and Ward were charged with the robbery of Michelle and Mark, receipt of stolen property, and assault of Joe Johnson with a firearm. In connection with the robbery charges, it was charged that defendant and Ward acted in concert and entered an inhabited structure (in violation of section 213, subdivision (a)(1)(A)), that Ward was armed with a firearm, and that defendant personally used a firearm in the commission of each robbery. Defendant alone was charged with being a felon in possession of a firearm (§ 12022.53, subd. (b)).

Defendant and Ward were tried together before the same jury.

The key issue in the case was identity, because none of the victims were able to describe or identify their assailants. The prosecution's theory was that defendant was the robber who personally pointed a gun at Michelle and Mark in the course of the robberies, and that Ward was liable only as an aider and abettor. As to the assault on Joe, the prosecution sought to hold both defendant and Ward liable as aiders and abettors under the theory that an assault with a deadly weapon was the natural and probable consequence of their participation in an armed home-invasion robbery.

For their part, the defense sought to impeach the victims' testimony by (among other things) highlighting the inconsistencies between their trial testimony and their reports to police on the night of the crimes. They introduced a stipulation that Michelle had reported to police that the robbers arrived when she was standing on her front porch trying to unlock the door, not while sitting in the car; that she never saw any gun, but only felt "something hard being pushed against [her] head"; and that she did not report to police that she was pistol-whipped by her attackers. In addition, they showed that Michelle had several felony convictions. They also elicited testimony that in contrast to his trial testimony, Joe had advised police that he had seen only one robber in the hallway outside the

9

bedroom and mentioned that only one other robber entered the room.

At trial, Joe testified that he told police that "the first guy sounded black, but he could have been a white kid raised in the ghetto, [and] the second guy was lighter than the first." To rebut Joe's testimony that even though he could not remember seeing the skin color of any of the robbers, his use of the word "lighter" in his earlier interview with police must have referred to the robbers' respective skin color, the officer who interviewed Joe testified for the defense that Joe reported that he could not describe the robbers' race and used the word "lighter" to describe the robbers' relative weights.

Eva's credibility was challenged with her admissions that her original reports to police falsely omitted all mention of her boyfriend Emory: Because Emory had an outstanding warrant for his arrest, she told police that she (not Emory) saw the assailants from the front window and that she (not Emory) was driving when her car was fired upon.

Defendant emphasized that no fingerprints were found on the Beretta pistol recovered by the police. And Sergeant Rinelli testified that he did not see defendant drop or toss any weapon as he emerged from the Cadillac, even though he had a clear view of defendant the entire time and the street lights were bright.

To explain why codefendant Ward had $400 in his pocket when the Cadillac was stopped, his girlfriend testified on his behalf that she had given him $400 in cash on the night of the robberies.

The jury nonetheless found both defendants guilty on all counts and found true all enhancement allegations submitted to them.

Respondent's Lodged Document 4, pp. 3-10.

IV.  Discussion

A. Claims Challenging Use of Juvenile Conviction as Strike: Amended Petition, Supplemental Petition (Claims 5, 8)

The amended petition raises the following claims challenging use of petitioner's prior juvenile conviction as a strike.  First, petitioner argues that the juvenile conviction should not have been used as a strike because the sentencing judge during the juvenile proceedings failed to state on the record what factors he considered in aggravation as well as the reasons for confining him to the California Youth Authority (CYA) for the maximum allowable period. Petitioner also alleges that his prior juvenile conviction should not have been used as a strike because it should have been reduced to a misdemeanor following his release from CYA.  The

amended petition also appears to raise a claim alleging that use of the prior juvenile conviction as a strike violated <u>Apprendi v. New Jersey</u>, <u>supra</u>.

Claim 5 of the supplemental petition realleges the claim that use of the prior juvenile conviction as a strike violated <u>Apprendi v. New Jersey</u>, <u>supra</u>.  Claim 8 realleges the claim that petitioner's juvenile conviction should not have been used as a strike because it should have been reduced as a misdemeanor when he was discharged from the Youth Authority.  The court now turns to the merits of these claims.

Petitioner's claims alleging that his juvenile conviction should not have been used as a strike because the sentencing judge failed to state on the record what factors he considered in aggravation as well as the reasons for confining him to CYA for the maximum period challenge the validity of the prior juvenile conviction.

The United States Supreme Court held in <u>Lackawanna County District Attorney v. Coss</u>, 532 U.S. 394, 121 S.Ct. 1567 (2001), that "once a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available....the conviction may be regarded as conclusively valid.  If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained."  <u>Lackawanna</u>, 532 U.S. at 403-404, 121 S.Ct. 1567.

The Supreme Court recognized an exception to this rule where the prior conviction was obtained in violation of the Sixth Amendment right to counsel under <u>Gideon v. Wainright</u>, 372 U.S. 335, 83 S.Ct. 792 (1963).  <u>See</u> <u>Lackawanna</u>, 532 U.S. at 404.  The Supreme Court also left open the possibility of two other exceptions – where the defendant cannot be faulted for failing to obtain timely review of a constitutional claim (e.g., where a state court, "without justification, refuses to rule on a constitutional claim that has been properly presented to it"), and where, after the time for direct or collateral review has expired, the defendant obtains "compelling evidence that he is actually innocent of the crime for which he was convicted, and

1  which he could not have uncovered in a timely manner." See id. at 405.

2          Petitioner was incarcerated in the CYA from 1993-1997 following his juvenile

3  conviction.  Respondent's Lodged Document 32.  There is no claim that petitioner was on

4  probation or parole for this offense at the time of his 2002 conviction for the at-issue offenses.

5  Therefore, petitioner's claims challenging the validity of his juvenile conviction are barred

6  pursuant to Lackawanna.  None of the exceptions to Lackawanna apply because petitioner was

7  represented by counsel during his juvenile proceedings, see respondent's lodged document 26,

8  and nothing in the record indicates that either of the other two exceptions apply.  The denial of

9  this claim by the California Supreme Court was not an unreasonable application of clearly

10  established Supreme Court authority.

11          Petitioner argues that his juvenile conviction should not have been used as a strike

12  because under state law it should have been reduced to a misdemeanor following his release from

13  CYA.

14          "[I]t is not the province of a federal habeas court to reexamine state court

15  determinations on state law questions." Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475

16  (1991). Habeas corpus relief is unavailable for alleged errors in the interpretation or application

17  of state sentencing laws by either a state trial or appellate court, unless the error resulted in a

18  complete miscarriage of justice.  Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468 (1962);

19  Hendricks v. Zenon, 993 F.2d 664, 674-75 (9th Cir.1993).  So long as a state sentence "is not

20  based on any proscribed federal grounds such as being cruel and unusual, racially or ethnically

21  motivated, or enhanced by indigency, the penalties for violation of state statutes are matters of

22  state concern."  Makal v. State of Arizona, 544 F.2d 1030, 1035 (9th Cir.1976).  Thus, "[a]bsent

23  a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws

24  does not justify federal habeas relief."  Christian v. Rhode, 41 F.3d 461, 469 (9th Cir.1994).

25          For the following reasons, the court finds no violation of fundamental fairness

26  because under state law petitioner's juvenile conviction was properly used as a strike.  Cal. Penal

Code § 667(d)(3) provides that a prior juvenile adjudication shall constitute a prior felony

conviction for purposes of sentence enhancement if:

> (A) The juvenile was 16 years of age or older at the time he or she committed the prior offense.
> (B) The prior offense is listed in subdivision (b) of Section 707 of the Welfare and Institutions Code or described in paragraph (1) or (2) as a felony.
> (C) The juvenile was found to be a fit and proper subject to be dealt with under the juvenile court law.
> (D) The juvenile was adjudged a ward of the juvenile court within the meaning of Section 602 of the Welfare and Institutions Code because the person committed an offense listed in subdivision (b) of Section 707 of the Welfare and Institutions Code.

Cal. Penal Code § 667(d)(3).

After reviewing the transcript from the court trial on the validity of the prior, the

court finds that petitioner's juvenile conviction for assault with a firearm met the requirements

set forth in Cal. Penal Code § 667(d)(3).  See RT at 875-876.   For this reason, no violation of

fundamental fairness occurred by use of the juvenile conviction as a strike.  After independently

reviewing the record, the court finds that the denial of this claim by the California Supreme Court

was not an unreasonable application of clearly established Supreme Court authority.

On direct appeal, petitioner raised the claim that use of his prior juvenile

conviction as a strike violated Apprendi, supra.  The California Court of Appeal denied this

claim for the following reasons:

> II. The Trial Court Properly Considered Defendant's Prior Juvenile Adjudication As a Strike
>
> In a bifurcated proceeding, the trial court found that defendant suffered a prior adjudication as a juvenile which qualified as a strike. The court accordingly sentenced defendant as a second-strike offender.
>
> On appeal, defendant claims that his "prior juvenile adjudication was not usable to enhance his sentence" because any qualifying prior conviction must have been obtained through proceedings that included the right to a jury trial and proof beyond a reasonable doubt. He observes that that was not the case with respect to a prior juvenile adjudication.
>
> In support of his contention, defendant relies upon the United States Supreme Court's decision in Apprendi v. New Jersey (2000) 530 U.S. 466 [147 L.Ed.2d

13

435] ( Apprendi ) and the Ninth Circuit's decision in United States v. Tighe (9th Cir.2001) 266 F.3d 1187 ( Tighe ). Apprendi held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." ( Apprendi, supra, 530 U.S. at p. 490, 120 S.Ct. at p. ---- [147 L.Ed.2d at p. 455].) And in Tighe, supra, 266 F.3d 1187, a divided panel of the Ninth Circuit held that prior juvenile adjudications do not fall within Apprendi' s "prior conviction" exception to its general rule on the right to a jury because the constitutional use of a prior conviction is based on the assumption that the accused was afforded fundamental procedural protections at the time of the prior conviction, including the right to a jury trial. ( Tighe, at p. 1193.) Tighe concluded that "the 'prior conviction' exception to Apprendi's general rule must be limited to prior convictions that were themselves obtained through proceedings that included the right to a jury trial and proof beyond a reasonable doubt. Juvenile adjudications that do not afford the right to a jury trial and a beyond-a-reasonable-doubt burden of proof, therefore, do not fall within Apprendi' s 'prior conviction' exception." ( Tighe, at p. 1194.)

The dissent in Tighe reasoned that prior convictions appropriately may be subjected to a lesser standard of proof because the defendant presumably received all the process that was due at the time of that prior conviction. And because "a juvenile receives all the process constitutionally due at the juvenile stage, there is no constitutional problem (on which Apprendi focused) in using that adjudication to support a later sentencing enhancement ." ( Tighe, supra, 266 F.3d at p. 1200 (dis. opn. of Brunetti, J .).)

Subsequent cases have sided with the Tighe dissent. For instance, United States v. Smalley (8th Cir.2002) 294 F.3d 1030 ( Smalley ), concluded that a juvenile adjudication is sufficiently reliable to come within the Apprendi exception for prior convictions without offending due process because such an adjudication affords the constitutional rights to notice, counsel, confrontation, and cross-examination and against self-incrimination, and further must be based on proof beyond a reasonable doubt. ( Smalley, at p. 1033.) And the Court of Appeal for the Second Appellate District relied upon similar reasoning to reach the same result. ( People v. Bowden (2002) 102 Cal.App.4th 387, 392-394, 125 Cal.Rptr.2d 513; see also State v. Hitt (Kan.2002) 273 Kan. 224, 42 P.3d 732, 740, cert. den. sub nom. Hitt v. Kansas (2003) 537 U.S. 1104 [154 L.Ed.2d 772].)

Furthermore, " Apprendi and Tighe have no direct application here. In both of those cases the fact that increased the defendant's sentence above the statutory maximum was not tried or proved by the usual criminal standards in the trial of the current case, but was a factual finding solely by a sentencing judge ostensibly as a sentencing consideration. This is not at all like proof of a strike under California's Three Strikes law. Under the Three Strikes law a qualifying prior conviction must, in the current case, be pleaded and proved [citation] beyond a reasonable doubt [citations], and the defendant has a statutory right to a jury trial, at least on the issue whether the defendant suffered the prior conviction [citations]. Because the context is so different, Apprendi and Tighe do not apply here. This is apparent from a footnote in Tighe distinguishing statutes under which prior convictions are determined by a jury or tried in the manner of elements of a crime." ( People v. Bowden, supra, 102 Cal.App.4th at pp. 392-393,

14

1      125 Cal.Rptr.2d 513.)

2      Defendant argues nonetheless that he "was not afforded the right to a jury trial on
       whether he had committed a robbery"-the offense that underlay his juvenile
3      adjudication. But it was not the underlying offense that increased defendant's
       sentence, but the fact that he was adjudicated in a court of committing a prior
4      qualifying crime, which triggered the Three Strikes law. To require that the
       underlying crime, rather than the prior conviction or adjudication of the crime, be
5      proven in the present trial would alter the elements specified by the Three Strikes
       law. It would also require prosecutors to put on evidence of the underlying offense
6      years later (to the detriment of the People) or require juvenile adjudications to be
       tried to juries to preserve the People's right to use them years later as prior
7      convictions (to the detriment of the juvenile justice system). By the very language
       of the Three Strikes law as well as logic, it must be the fact of the prior
8      adjudication, not the underlying offense, that must be determined by the trier of
       fact.
9
       In accordance with the persuasive authority distinguishing and disagreeing with
10     Tighe, we conclude that a second-strike sentence was properly imposed on the
       basis of the trial court's finding beyond a reasonable doubt that defendant had
11     suffered a prior juvenile adjudication. "Since a juvenile constitutionally-and
       reliably ( McKeiver v. Pennsylvania [ (1971) ] 403 U.S. [528,] 547 [29 L.Ed.2d
12     647] )-can be adjudicated a delinquent without being afforded a jury trial, there is
       no constitutional impediment to using that juvenile adjudication to increase a
13     defendant's sentence following a later adult conviction." ( People v. Fowler (1999)
       72 Cal.App.4th 581, 586, 84 Cal.Rptr.2d 874.) FN9
14
               FN9. We acknowledge that Fowler was decided before Apprendi
15             or Tighe, but its analysis on this point is nonetheless sound and has
               been subsequently followed. ( People v. Bowden, supra, 102
16             Cal.App.4th at p. 394, 125 Cal.Rptr.2d 513.)]

17     Finally and in any event, the remedy for the asserted flaw of using a juvenile
       adjudication as a prior conviction under the Three Strikes law would be to require
18     the prosecutor to prove the juvenile adjudication to the jury at the trial of the
       current offense. ( Tighe, supra, 266 F.3d at p. 1200 (dis. opn. of Brunetti, J.).)
19     Here, having had notice of the charge of the prior adjudication, defendant waived
       the right to a jury trial on the truth of the prior conviction allegation, and his
20     waiver was unqualified. Nor does he contest that his statutory right to a jury trial
       on the prior conviction was insufficient nor challenge the scope of that statutory
21     right. (§ 1025, subd. (c).) Having unqualifiedly waived his right to a jury trial on
       the truth of the prior adjudication allegation and having not contested the scope of
22     that right, he cannot now complain that the use of that prior juvenile adjudication
       violated Apprendi.
23

24     For the foregoing reasons, defendant's claim of error fails.

25  Respondent's Lodged Document 4, pp. 28-32.

26  \\\\\

1          For the reasons stated by the California Court of Appeal, the court finds that the

2    denial of this claim by the state appellate court was not an unreasonable application of clearly

3    established Supreme Court authority.  The court agrees with the California Court of Appeal that

4    petitioner waived his <u>Apprendi</u> claim when he waived his right to a jury trial on the juvenile

5    conviction.  <u>See</u> <u>Blakely Washington</u>, 542 U.S. 296, 310, 124 S.Ct. 2531 (2004) ("nothing

6    prevents a defendant from waiving his <u>Apprendi</u> rights"; "a defendant who stands trial may

7    consent to judicial factfinding as to sentence enhancements.").

8          In addition, the Ninth Circuit has recognized that both California courts and other

9    federal circuit courts of appeal disagree with its holding in <u>Tighe</u>, <u>supra</u>.  <u>See</u> <u>Boyd v. Newland</u>,

10   467 F.3d 1139, 1152 (9th Cir. 2006).  Thus, while <u>Tighe</u> remains good law in the Ninth Circuit,

11   "the opinion does not represent clearly established federal law 'as determined by the Supreme

12   Court of the United States.'" <u>Boyd</u>, 467 F.3d at 1152 (quoting 28 U.S.C. § 2254(d)(1)).

13   Therefore, the California Court of Appeal did not unreasonably apply clearly established federal

14   law by concluding that the trial court properly considered petitioner's juvenile conviction when it

15   sentenced petitioner.  This claim does not merit federal habeas relief.

16              B.  <u>Amended Petition: Denial of Right to Counsel</u>

17         In the amended petition, petitioner argues that he was denied his right to counsel

18   when the trial court refused his request to reappoint counsel.  This claim is also raised as claim

19   one in the supplemental petition.

20              *State Court Opinion*

21         The background to this claim is contained in the opinion of the California Court

22   of Appeal:

23         I. The Trial Court's Denial of Defendant's Request to Reappoint Counsel Was an
           Abuse of Discretion
24
25         Defendant contends that "[t]he trial court committed reversible error when it
           refused to permit [defendant] to withdraw his Faretta waiver" and to reinstate
           counsel. For reasons that we shall explain, we agree that the trial court abused its
26         discretion in denying the request.

                                              16

A. Defendant's Request for Reappointment of Counsel

In Faretta, supra, 422 U.S. 806 [45 L.Ed.2d 562], the United States Supreme Court held that the right to assistance of counsel guaranteed by the Sixth and Fourteenth Amendments includes the right of an accused to represent himself at trial when he voluntarily and intelligently elects to do so.

During pretrial proceedings on November 2, 2001, defendant sought and received permission to represent himself.

At the time that defendant's Faretta motion was granted, he was represented by attorney Laurance Walton and had made three unsuccessful MarsdenFN4 motions for substitution of counsel.

> [FN4. People v. Marsden (1970) 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44.]

The matter trailed, however. In December 2001, defendant submitted a written application for "Appointed Assistant Counsel" under the rule permitting appointment of a second counsel in capital cases. The request was denied.

On January 3, 2002, the first day of trial, the court conducted a hearing on various applications and motions in limine. Toward the end of the day, defendant announced: "I wish to acquire counsel, because this jury selection, I don't know nothing about. [¶] ... [¶] ... Man, this is overwhelming. You've all been going back and forth, confusing me, I don't know what the heck is going on." The trial court refused his request, noting that because defendant was "waiting until the last minute[,] I'm not going to grant the request now. [¶] ... [¶] ... I'm not going to revisit the whole issue of whether you knowingly and intelligently waived your right to counsel. That presumably was done by another judge in another department. We're not going to revisit that. [¶] I'm not going to continue this case so that you can obtain counsel. If you can find counsel to step in, fine, do it. But I'm not about to appoint counsel to represent you at this juncture. There isn't any attorney in the county that I'm aware of that would take it on at this short notice."

Defendant then asked the court if it would "grant me like someone to help me with these [ sic ] jury selection," which the court also refused, explaining: "That's part of what being in pro per means. That you are representing yourself. [¶] And you know, I'm sorry if you don't think that you are capable of doing this. But that decision you should have realized when you were making the [ Faretta ] choice in front of the home court to represent yourself."

On January 8, before jury selection began, defendant submitted a written motion for the appointment of counsel. The court denied the motion, noting that "I thought I had already dealt with this last week."

The following day, in the middle of jury selection, defendant made what he characterized as "a Marsden motion.... I want to fire myself." During the in camera hearing that followed, defendant restated that he felt inadequate to the task of representing himself and intended to ask for a continuance. The trial court denied defendant's request to be relieved of his pro per status, because "[i]t's not a

17

question of not being able to cooperate with yourself; it's not a question of some breakdown in communication with yourself." Moreover, the court explained: "We are in the process of picking a jury for this trial. It would, in my opinion be extremely disruptive, to-and not in the best interests of the administration of justice, certainly, to in effect grant a severance of these trials with you and [codefendant] Ward and that's in effect, what would happen."

B. The Trial Court Abused Its Discretion in Refusing to Reappoint Defense Counsel

Our Supreme Court has held that where a self-represented defendant seeks to relinquish responsibility for his own defense after commencement of the trial and to obtain the appointment of counsel, the trial court must exercise its discretion on the basis of the totality of the circumstances. ( People v. Lawley (2002) 27 Cal.4th 102, 149, 115 Cal.Rptr.2d 614, 38 P.3d 461; People v. Gallego (1990) 52 Cal.3d 115, 164, 276 Cal.Rptr. 679, 802 P.2d 169 .)

In exercising that discretion, the trial court should consider the factors described in People v. Windham (1977) 19 Cal.3d 121, 137 Cal.Rptr. 8, 560 P.2d 1187, which are also applicable when a defendant seeks to invoke his right to self-representation in the middle of trial: " 'Relevant factors should include, among others, the following: (1) defendant's prior history in the substitution of counsel and the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney....' [Citations.]" ( People v. Gallego, supra, 52 Cal.3d at p. 164, 276 Cal.Rptr. 679, 802 P.2d 169, quoting People v. Elliott (1977) 70 Cal.App.3d 984, 993-994, 139 Cal.Rptr. 205 ( Elliott ); People v. Lawley, supra, 27 Cal.4th at p. 149, 115 Cal.Rptr.2d 614, 38 P.3d 461; People v. Windham, supra, 19 Cal.3d at p. 128, 137 Cal.Rptr. 8, 560 P.2d 1187.)

But " '[w]hile the consideration of these criteria is obviously relevant and helpful to a trial court in resolving the issue, they are not absolutes, and in the final analysis it is the totality of the facts and circumstances which the trial court must consider in exercising its discretion as to whether or not to permit a defendant to again change his mind regarding representation in midtrial.' " ( People v. Gallego, supra, 52 Cal.3d at p. 164, 276 Cal.Rptr. 679, 802 P.2d 169.)

In the case before us, defendant contends that (1) "a motion for self [-]representation made on the day of trial is not untimely where a continuance of the trial is not sought," (2) the trial court failed to ascertain "whether Mr. Walton [defendant's former appointed counsel] was then available and could resume representation" without a continuance, (3) there was no prior history of substitution of counsel, (4) defendant had sound reasons for desiring to withdraw his Faretta waiver, and (5) "it was unlikely that [defendant] would be able to effectively represent himself."

In evaluating defendant's contentions, we focus exclusively on his January 3 request-his first unequivocal request to be relieved of self-representation and for

18

the reappointment of counsel.FN5

> [FN5. Defendant does not challenge the propriety of the court's denial of his December 2001 request for the appointment of a "second counsel" under Penal Code section 987, subdivision (d), and we discern no error. By its own terms, that subdivision pertains to capital cases only.]

In so doing, we reject the Attorney General's characterization of defendant's January 3 request as a motion only for advisory counsel to help with jury selection.

To the contrary, defendant only asked for advisory counsel to assist with jury selection after the court denied his request for the reappointment of defense counsel. Defendant's dialogue with the court was as follows:

DEFENDANT JOHN-CHARLES: Before we start, may I address the court? I mean, on the record of course.

"THE COURT: Yes.

"DEFENDANT JOHN-CHARLES: I wish to acquire counsel, because this jury selection, I don't know nothing about.

"THE COURT: Unfortunately, Mr. John-Charles, you know you're waiting until the last minute. I'm not going to grant the request now.

"DEFENDANT JOHN-CHARLES: For the record, you're denying my right-request for counsel.

"THE COURT: Today is the date set for trial.

"DEFENDANT JOHN-CHARLES: Man, this is overwhelming. You've all been going back and forth, confusing me, I don't know what the heck is going on.

"THE COURT: I'm not going to revisit the whole issue of whether you knowingly and intelligently waived your right to counsel.... [¶] I'm not going to continue this case so that you can obtain counsel. If you can find counsel to step in, fine, do it. But I'm not about to appoint counsel to represent you at this juncture. There isn't any attorney in the county that I'm aware of that would take it on at this short notice."

The parties then turned to other matters, after which defendant asked, "And for the record, you're denying reappointment of counselor-counsel to assist?" The court reiterated that it was "not appointing counsel to represent you at this late date," to which defendant then asked, "Would you be willing to grant me like someone to help me with these [ sic ] jury selection."

Accordingly, we conclude that the record is relatively clear, based on both defendant's requests and the court's responses, that defendant did ask for the reappointment of counsel, and not simply for an advisory counsel on January 3. The court's response to defendant's subsequent written motion on January 8 for the

appointment of counsel further confirms this.

We now turn to whether the trial court's denial of defendant's request for the reappointment of counsel on January 3 was an abuse of discretion. In response to defendant's request, the trial court focused exclusively on its timing, stating that defendant had "wait[ed] until the last minute" to request the appointment of counsel and that the court was "not going to grant the request now."

But the trial court should not have denied the request, without considering the resulting prejudice, simply because defendant had waited until the day of trial to make it. Several Courts of Appeal have held that when a defendant seeks to be relieved of his pro per status and asks for the reappointment of counsel at or around the time of jury selection and before any evidence has been introduced, the trial court's refusal to do so is an abuse of discretion. ( People v. Hill (1983) 148 Cal.App.3d 744, 196 Cal.Rptr. 382 ( Hill ) [denial of request for reappointment of counsel before jury selection held to be abuse of discretion]; People v. Cruz (1978) 83 Cal.App.3d 308, 147 Cal.Rptr. 740 ( Cruz ) [denial of request on date originally set for trial held to be abuse of discretion]; Elliott, supra, 70 Cal.App.3d 984, 139 Cal.Rptr. 205 [denial of request made immediately after jury selection held to be abuse of discretion].)

In each of these cases, the courts held that the requests came at an early stage of the trial and would not have required lengthy continuances or prejudiced the prosecution; accordingly, they found improper the trial courts' denial of the motions on the mere basis that continuances would be necessary. ( Hill, supra, 148 Cal.App.3d at p. 761, 196 Cal.Rptr. 382; Cruz, supra, 83 Cal.App.3d at pp. 320-321, 147 Cal.Rptr. 740; Elliott, supra, 70 Cal.App.3d at pp. 996-998, 139 Cal.Rptr. 205.) FN6 Cruz observed: "In both Elliott and the present case, no showing was made by the prosecution that the requested continuances would cause a disruption in the calendar of the courts, that it would be detrimental to the prosecution of the cases, or that it would be contrary to the interests of justice." ( Cruz, supra, 83 Cal.App.3d at p. 321, 147 Cal.Rptr. 740.) Further, " Cruz and Elliott hold unequivocally that a far stronger showing [than reappointed counsel's unwillingness to commence trial immediately] is necessary before the court may base its denial of reinstatement on its concern for delay in the proceedings." ( Hill, supra, 148 Cal.App.3d at p. 761, 196 Cal.Rptr. 382.)

[FN6. Hill and Cruz also involved the fact that the defendants' initial Faretta waivers had been ineffective because they were tainted by the trial courts' improper denial of the defendants' Marsden motions. ( Hill, supra, 148 Cal.App.3d at p. 760, 196 Cal.Rptr. 382; Cruz, supra, 83 Cal.App.3d at p. 318, 147 Cal.Rptr. 740.) But while there is no contention in the present case that the denial of defendant's Marsden motions was improper, the Marsden error in the prior cases was not the determinative factor in those courts' analyses. And Elliott, like the present case, did not involve the ineffectiveness of the initial Faretta motion.]

Application of these principles to the present case demonstrates that the trial court abused its discretion in denying defendant's request for the reappointment of counsel. In rejecting defendant's request to be relieved of self-representation, the trial court based its denial solely on the timing of defendant's request, which was

insufficient to premise a denial given that jury selection had not yet begun. Critically, the trial court failed to inquire or assess whether any delay or prejudice would result from the appointment of counsel. Instead, the court simply announced that it would deny the request of any counsel who could not "step in[to]" the proceedings. But it did not even determine whether defendant's prior counsel was available to resume the representation that he had handled just two months earlier.

It is conceivable, of course, that defendant's prior counsel could not resume the representation, that new counsel would have required a substantial continuance, and that a severance of defendant's trial from that of his codefendant would have been required. But none of this was explored. In short, there is nothing in the record to establish that the reappointment of counsel would have caused a significant delay or disruption of the trial proceedings. (Cf. People v. Lawley, supra, 27 Cal.4th at pp. 150-151 & fn. 20, 115 Cal.Rptr.2d 614, 38 P.3d 461.)

In contrast, when a defendant seeks to relinquish his right to self-representation after the presentation to the jury has begun, the Courts of Appeal have found nothing improper in the trial court's refusal to grant the request. (E.g., People v. Lawley, supra, 27 Cal.4th at p. 151, fn. 20, 115 Cal.Rptr.2d 614, 38 P.3d 461 [no abuse of discretion in denying request made after guilt phase but before penalty phase in capital case, distinguishing Hill, Cruz, and Elliott ]; People v. Gallego, supra, 52 Cal.3d at p. 164, 276 Cal.Rptr. 679, 802 P.2d 169 [no abuse of discretion in denying request made late in the guilt phase of the trial]; People v. Smith (1980) 112 Cal.App.3d 37, 48-51, 169 Cal.Rptr. 108 [no abuse of discretion in denying request made on the second day of trial, after opening statements and "after a crucial witness (a victim) had already testified"]; People v. Smith (1980) 109 Cal.App.3d 476, 485, 167 Cal.Rptr. 303 [no abuse of discretion in denying request made midtrial: "It is important to note that in both Elliott and Cruz, the requests were made before any evidence was taken, whereas in the instant case the request for reinstatement of the public defender was not made until after the People had completed their case and rested "].)

But here, defendant's request was made before jury selection, and thus reappointment of counsel would not have inconvenienced the jury. And there was no showing of prejudice or disruption. "Absent a showing of the degree of delay or of any serious effect on the administration of justice, the denial of [defendant's] request for reinstatement of ... counsel was an abuse of discretion." ( Hill, supra, 148 Cal.App.3d at p. 762, 196 Cal.Rptr. 382.)

Further, an examination of all five Windham criteria also support reinstatement of defense counsel in this case: (1) Defendant did not have a prior history of changing from self-representation to appointed counsel; (2) defendant's reasons set forth for reappointment-that "this is overwhelming" and "I don't know what the heck is going on"-were a valid recognition that the defendant could not compete with the prosecutor; (3) the request came before jury selection; (4) there was no showing of disruption or delay; and (5) defendant was not likely to be effective in defending himself.

Based on the record before us, we must conclude that the trial court abused its discretion in denying defendant's request. A trial court's discretion " 'is neither

arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice. [Citations.]' [Citation.] ... '[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' [Citation.]" ( People v. Superior Court ( Alvarez ) (1997) 14 Cal.4th 968, 977, 60 Cal.Rptr.2d 93, 928 P.2d 1171.)

In light of the trial court's failure to consider any factor (including prejudice and disruption) other than the timing of defendant's request-which, in and of itself, did not warrant denial-the exercise of its discretion cannot be said to be " 'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' " ( People v. Superior Court ( Alvarez ), supra, 14 Cal.4th at p. 977, 60 Cal.Rptr.2d 93, 928 P.2d 1171.) And for the very reason that defendant sought to have counsel reappointed-that he had no specialized legal knowledge and had come to feel inadequate to the task of defending himself-he was in no position to urge the court to consider the appropriate factors. (See People v. Rivers, 20 Cal.App.4th 1040, 1051-1052, 25 Cal.Rptr.2d 602 ["It is candidly recognized that a defendant who represents himself virtually never improves his situation or achieves a better result than would trained counsel"], citing Faretta, supra, 422 U.S. at p. 834 [45 L.Ed.2d at p. 581].) Accordingly, the trial court abused its discretion in denying defendant's request.

C. The Error Was Not Harmless as to Findings That Defendant Personally Used a Firearm

Defendant urges that the erroneous denial of his request to withdraw his Faretta waiver and to appoint counsel requires automatic reversal, citing Gideon v. Wainwright (1963) 372 U.S. 335 [9 L.Ed.2d 799].

But while "some constitutional errors require reversal without regard to the evidence in the particular case," like the complete denial of the right to counsel or the adjudication by a biased judge, because such errors necessarily render a trial fundamentally unfair, "there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." ( Rose v. Clark (1986) 478 U.S. 570, 577, 579 [92 L.Ed.2d 460, 470-471], disapproved on another ground in Yates v. Evatt (1991) 500 U.S. 391, 402-403, 111 S.Ct. 1884, 114 L.Ed.2d 432, fn. 8 [114 L.Ed.2d 432, 448, fn. 8].) " 'The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, [citation], and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' [Citations.]" ( Id. at p. 577 [92 L.Ed.2d at p. 470].)

In this case, it is not the court which deprived defendant of the assistance of counsel, but defendant's own considered decision to exercise his constitutional right under Faretta to represent himself at trial. Accordingly, several California Courts of Appeal have employed a harmless error analysis in determining whether a trial court's denial of a request to withdraw a Faretta waiver and to reappoint counsel was prejudicial. ( People v. Ngaue (1991) 229 Cal.App.3d 1115, 1127, 280 Cal.Rptr. 757; People v. Sampson (1987) 191 Cal.App.3d 1409, 1418, 237

Cal.Rptr. 100; Hill, supra, 148 Cal.App.3d at p. 762, 196 Cal.Rptr. 382; Elliott, supra, 70 Cal.App.3d at p. 998, 139 Cal.Rptr. 205.) As explained by the court in Elliott, "[s]ince defendant has exercised his constitutional right of self-representation, an abuse-of-discretion error in not permitting defendant to change his mind does not appear to us to be of constitutional dimension." ( Id. at p. 998, 139 Cal.Rptr. 205.)

The Attorney General argues that the Watson standard applies. ( People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243.) And the weight of authority suggests that Watson states the correct standard of review, i.e., whether it is reasonably probable that a different result would have occurred absent the error. ( People v. Sampson, supra, 191 Cal.App.3d at p. 1418, 237 Cal.Rptr. 100; Elliott, supra, 70 Cal.App.3d at p. 998, 139 Cal.Rptr. 205; Hill, supra, 148 Cal.App.3d at p. 762, 196 Cal.Rptr. 382.)

Nonetheless, we acknowledge that other authority suggests that we should consider whether the error in denying defendant's request for the reappointment of counsel was harmless beyond a reasonable doubt pursuant to Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705]. (See People v. Carroll (1983) 140 Cal.App.3d 135, 144, 189 Cal.Rptr. 327.)

But here, even using the Chapman standard, the effect of the error on defendant's convictions for the robberies, the possession of a firearm by a felon, and the receipt of stolen property was harmless beyond a reasonable doubt, given the evidence against him: Defendant was in a car seen by officers leaving the scene of the robberies moments after Eva's 911 call; the car contained property taken from the duplex; one of the victims identified the car as the one driven by the robbers and another identified the car as having been driven past the duplex shortly before the attack with no rear license plate light; defendant ran when police tried to stop the car, and officers saw defendant wearing clothing identical to that which the victims had described as being worn by the assailants; and a handgun was found near the open car door from which defendant fled. Thus, even if the trial court had granted defendant's request to reappoint counsel, we conclude beyond a reasonable doubt that based on the evidence, a jury would have found that defendant had participated in the robberies of Michelle and Mark, that he had possessed property stolen from the duplex, and that he had in his possession, custody, or control the handgun before he leapt from the car in an attempt to escape police. This is further borne out by the fact that defendant's codefendant, who was represented by counsel, was found guilty of the same offenses.

And because defendant's conviction for assaulting Joe was sought on the vicarious liability theory that the assault with a deadly weapon was the natural and probable consequence of defendants' participation in an armed home-invasion robbery, the jury would have found defendant guilty on that charge, even absent the error, as it did in the case of his codefendant.

But the same cannot be said of the allegations that defendant "personally use [d] a firearm" during the robberies of Michelle and Mark within the meaning of section 12022.53.FN7 There was no direct evidence that defendant personally used a firearm: Neither robbery victim was able to identify any particular robber as the one who pointed a gun at them, who hit them with a gun, or who used the gun

while taking their property. Nor did the circumstantial evidence necessarily establish that defendant personally used a firearm. The victims testified that there were three or four robbers, but they did not testify that each of the robbers had a gun. In fact, Joe Johnson testified that only two of the four robbers were armed. And although the presence of a handgun on the sidewalk near the point at which defendant fled the car provides evidence that he had possession, custody, or control of the gun while in the car, it does not necessarily establish that he, rather than another of the robbers, actually used the gun on the victims during the robberies. In light of the foregoing, defendant might well have benefited from the assistance of counsel: An attorney for defendant could have argued persuasively, for example, that the evidence did not show that defendant personally used a firearm within the meaning of the enhancement statute. We cannot say beyond a reasonable doubt that the error was harmless or that it is not reasonably probable that the result would have been different absent the error.

> [FN7. Section 12022.53 states in pertinent part:
> "(a) This section applies to the following felonies: [¶] ... [¶] (4) Section 211 (robbery). [¶] ... [¶]
> "(b) Notwithstanding any other provision of law, any person who is convicted of a felony specified in subdivision (a), and who in the commission of that felony personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply."]

In light of the trial court's abuse of its discretion in denying defendant's request for the reappointment of counsel, the jury's findings that the defendant personally used a firearm in the robberies must be vacated. However, since the prosecution was not responsible for the error, cases arguing, on fairness grounds, against retrial of an enhancement allegation that is reversed because of prosecutorial error are inapposite. (E.g., People v. Najera (1972) 8 Cal.3d 504, 510-512, 105 Cal.Rptr. 345, 503 P.2d 1353, disapproved on another ground in People v. Wiley (1995) 9 Cal.4th 580, 587-588, 38 Cal.Rptr.2d 347, 889 P.2d 541.) And defendant does not contend that retrial is barred in the event of a reversal based on the failure to reappoint counsel and has therefore waived any contrary contention. ( Barthelemy v. Chino Basin Mun. Water Dist. (1995) 38 Cal.App.4th 1609, 1613, fn. 2, 45 Cal.Rptr.2d 688; Kim v. Sumitomo Bank (1993) 17 Cal.App.4th 974, 979, 21 Cal.Rptr.2d 834.) Thus, the firearm enhancements are vacated and remanded for retrial if the People so elect.FN8

> [FN8. As a result, we need not consider defendant's claims on appeal that the trial court erred in instructing the jury on the firearm enhancements based on the juxtaposition of instructions, which will not arise during a retrial. Nor need we determine whether defendant was entitled to a sua sponte instruction on a lesser included enhancement, particularly in light of the rejection of such a claim in People v. Majors (1998) 18 Cal.4th 385, 410-411, 75 Cal.Rptr.2d 684, 956 P.2d 1137. Finally, in light of the evidence cited above, we reject defendant's argument that insufficient evidence supported the jury findings that he personally used a firearm in each robbery. Viewing the evidence in the light most favorable to the respondent, and presuming the existence of every fact that the jury could

24

1    reasonably deduce from the evidence ( People v. Johnson (1980) 26 Cal.3d
2    557, 576, 162 Cal.Rptr. 431, 606 P.2d 738), the fact that at least one of the
robbers used a gun multiple times and the fact that the gun located by
police (and accurately described by one of the victims) was found near the
3    open car door from which defendant fled was sufficient to raise a
reasonable inference that he was one of the robbers who had used a gun.
4    To find that such circumstantial evidence is insufficient would reward the
well-disguised criminal who acts in concert with other disguised criminals,
5    making it difficult to directly determine who did what.]

6 Respondent's Lodged Document 4, pp. 10-27.

7        *Legal Background*

8        The United States Supreme Court has clearly established that a criminal defendant

9 has a constitutional right to counsel during criminal proceedings. <u>Gideon v. Wainwright</u>, 372

10 U.S. 335, 83 S.Ct. 792 (1963). The United States Supreme Court has also clearly established that

11 the Sixth Amendment right to counsel includes a right to self-representation. <u>Faretta v.</u>

12 <u>California</u>, 422 U.S. 806, 95 S.Ct. 2525 (1975).

13        In <u>Faretta v. California</u>, the United States Supreme Court held that an accused has

14 a Sixth Amendment right to conduct his own defense, provided only that he knowingly and

15 intelligently waives his right to counsel and that he is able and willing to abide by rules of

16 procedure and courtroom protocol. 422 U.S. at 821. The holding of <u>Faretta</u> is based on "the

17 long-standing recognition of a right of self-representation in federal and most state courts, and on

18 the language, structure, and spirit of the Sixth Amendment." <u>McKaskle v. Wiggins</u>, 465 U.S.

19 168, 174 (1984). In order to successfully invoke the right to self-representation, the defendant's

20 waiver of counsel must be "timely, not for the purposes of delay, unequivocal, and knowing and

21 intelligent." <u>United States v. Erskine</u>, 355 F.3d 1161, 1167 (9th Cir. 2004).

22        If a defendant chooses to represent himself, his decision to do so must be made

23 knowingly and intelligently. <u>Faretta</u>, 422 U.S. at 807; <u>Godinez v. Moran</u> 509 U.S. 389, 400

24 (1993). <u>See</u> <u>also</u> <u>Indiana v. Edwards</u>, __ U.S. __, 2008 WL 2445082 (June 19, 2008). The

25 purpose of the "knowing and voluntary" inquiry "is to determine whether the defendant actually

26 does understand the significance and consequences of a particular decision and whether the

1   decision is uncoerced." <u>Godinez</u>, 509 U.S. at 401.  "Although a defendant need not himself have

2   the skill and experience of a lawyer in order competently and intelligently to choose

3   self-representation, he should be made aware of the dangers and disadvantages of

4   self-representation, so that the record will establish that he knows what he is doing and his choice

5   is made with eyes open." <u>Faretta</u>, 422 U.S. at 835.  A trial court is not required to assess whether

6   petitioner is familiar with evidentiary rules or the relevant law.  <u>Id.</u> at 836.

7           *Discussion*

8           However, the issue here is not whether the initial waiver of counsel was

9   appropriate.  Petitioner's issue concerns his right to counsel on re-request after an initial, valid

10  waiver of that right had occurred.  Long established case law indicates that although the right to

11  counsel is not absolute after an initial stab at self-representation, the Sixth Amendment right to

12  counsel still exists if insufficient prejudice to the state would be engendered by continuing an

13  action to acquire counsel.

14          Petitioner has a clearly established Sixth Amendment right to counsel.  <u>See</u>

15  <u>Menefield v. Borg</u>, 881 F.2d 696, 700 (9th Cir. 1989) ("We are certainly unwilling to deny

16  counsel because of some conception that the defendant's initial decision to exercise his <u>Faretta</u>

17  right and represent himself at trial is a choice cast in stone.")

18          A criminal defendant may initially assert his right to self-representation and then

19  change his mind and request counsel for the remainder of the proceedings.  <u>Id.</u>  However, "the

20  right to counsel – once waived – is no longer absolute," and may be denied when it would delay

21  or disrupt proceedings by adversely affecting witnesses, counsel and the court.  <u>Id.</u>  The court

22  also considers whether the defendant is attempting to manipulate the right to counsel for

23  improper purpose.  <u>Id.</u> at 701.  The timing of the request to rescind self-representation and

24  appoint counsel is also important:

25          There is, however, a substantial practical distinction between delay on the event of
        trial and delay at the time of a post-trial hearing.  Cf. <u>United States v. Kennard</u>,
26      799 F.2d 556 (9th Cir. 1986)(per curiam)(absolute right to counsel in retrial after

1  defendant represented himself in initial trial).  Delay immediately prior to trial
2  engenders a significant potential for disruption of court and witness scheduling.
   Witnesses may have traveled long distances and may be unable to accommodate
3  more than one trip.  Losing or substantially inconveniencing witnesses may
   prejudice the trial and the efficient administration of justice.  Shifting lengthy
4  trials may disrupt the court's docket.

5  Id. at 700-701.

6          Also pertinent to the inquiry is the rather on-point case of United States v. Leveto,

7  540 F.3d 200 (3rd Cir. 2008).  In this case, defendant had initially waived the right to counsel.

8  However, during *voir dire* of the jury, defendant repeatedly requested that counsel be appointed

9  for him, telling the judge at one point (as did petitioner here) that he could not handle the tasks of

10  self-representation.  Id. At 205.  The trial judge, as did the trial judge here, found that the request

11  came too late and that no one could be appointed on a moment's notice to continue the trial.  Id.

12  at 205-206.  And again, as is the case here, the trial judge did not expressly inquire as to the

13  prejudice which would accrue if the trial were halted so that counsel could be appointed and

14  become familiar with the case.  More will be said about this later.  But importantly, Leveto

15  analyzed the issue as a denial of the Sixth Amendment right to counsel, albeit not an absolute

16  right (anymore).  Id. at 207.

17          Respondent confuses the lack of an absolute right to counsel with the existence of

18  the constitutional right *per se.*  The Sixth Amendment right to counsel does not evaporate simply

19  because it is no longer an absolute right.  The above cases certainly indicate that in the absence of

20  a proper decision on the re-request for counsel, the Sixth Amendment will have been violated.

21  Thus, the inquiry is not whether a constitutional right exists under Supreme Court authority, but

22  whether it has been violated – a determination whose standards may vary under the

23  circumstances of "never waived" versus "initially waived."   There need not be a specific

24  Supreme Court case detailing the precise level of inquiry into a re-request for counsel.  That level

25  of specificity of Supreme Court authority has never been required by AEDPA.  See Ferrizz v.

26  Giurbino, 432 F.3d 990, 993-94 (9th Cir. 2005).

27

1    Thus, two critical issues present themselves here – whether this court is bound in

2    this federal habeas review by the ruling of the Court of Appeal under state law that insufficient

3    inquiry into the prejudice component of the analysis had taken place, or whether the undersigned

4    can make an independent legal determination on this issue; and if the undersigned can make such

5    a determination, what is the outcome.

6    The undersigned first finds that he can make an independent determination.  The

7    statute at issue, 28 U.S.C. § 2254(d) is framed in the negative, that is when a habeas petition may

8    *not* be granted, and only concerns an application filed by petitioner.  The statute presumes that a

9    petitioner will not be in federal court if a state petition were granted, but does not speak to the

10   issue of when a subsidiary issue, which may be dispositive, was found in favor of the petitioner,

11   but the state petition was denied on other grounds.  Of course, the state has no right to seek

12   federal habeas if the state rulings did not go its way; thus the AEDPA is not concerned with the

13   determination of subsidiary or threshold issues which may not have been decided in favor of the

14   state.

15   For example, assume in a case that the state court obviously, erroneously found

16   that under the federal constitution, Miranda waivers could never be upheld.   However, the state

17   court went on to apply a harmless error rule to deny relief.  On application by petitioner, would

18   the federal court be bound to hold that under federal law, for the purposes of that case, all

19   Miranda waivers were invalid?  No purpose of AEDPA would be upheld with such a

20   determination.  The undersigned can find no case authority in this unusual procedural situation as

21   presented here and in the example; however, the logic of the statute speaks for itself.  Thus, the

22   undersigned will first review whether a violation of the Sixth Amendment right to counsel, in a

23   non-absolute situation, occurred.

24   The undersigned again looks to the recent, and factually similar Leveto case for

25   guidance.  Leveto held that generally an inquiry into the reasons for the defendant's request had

26   to be made.  Leveto, 540 F.3d at 208 and 209.  However, Leveto also held that where the reasons

28

1  for the request were evident from a "common sense reading of the entire record," <u>id</u>., the lack of

2  an inquiry was not dispositive.  Here, no one disputes the reasons given by petitioner for the re-

3  request of counsel – he felt overwhelmed.  A review of the entire transcript dealing with the

4  various trial motions and petitioner's perceived complaints reflects that fact all too well.  <u>See</u> RT

5  41-97.  Therefore, no further inquiry was necessary on this matter.

6          With respect to the prejudice inquiry (prejudice other than to petitioner), the

7  record is less clear.  As noted by the Court of Appeals, the prejudice inquiry is hampered by not

8  having the trial judge direct the court's attention to specific matters when the motion was denied.

9  Also, the prosecutor was never given an opportunity to set forth the prejudice.  However, the

10  record discloses sufficient information to understand that the state would have been significantly

11  prejudiced due to the circumstances of the case.  Indeed, the entire transcript of that "first day of

12  trial" does include pertinent statements by the judge which would obviously have been in play at

13  the specific time he denied the motion.

14          This is not the situation where the state would have been prejudiced because of

15  juror concerns.  As the record reflects, no jurors had actually been assigned from the pool for this

16  case at the time petitioner made his re-request for counsel.  In addition, because of the

17  assignment calendar system used by Sacramento County, this trial judge would not have been all

18  that inconvenienced by continuing this trial and accepting the next trial to be assigned.  However,

19  of primary importance, the state in this case would have been grossly prejudiced because

20  continuation of the trial would have required a severance of petitioner's trial from that of his co-

21  defendant.  RT 63.  Trying the same case twice is rarely something that adds to the efficiency of

22  the justice system, is only done when absolutely necessary, and often detracts from the fairness of

23  the proceeding.  The Clerk's Transcript reflects that the prosecution witnesses had become

24  hostile, i.e., cold feet, and warrants for their appearances were issued, put on hold and reissued,

25  etc. CT 5, 10, 12, 13, 14.   Trying to get these witnesses to appear for a second trial, much less

26  the first, would have been quite an endeavor, and may well have led to a miscarriage of justice

1   from society's point of view.  Finally, the case had been pending for approximately one year at

2   this time; not fostering further delay was a valid consideration.[3]

3             Thus, the undersigned concludes, from a federal perspective, that sufficient

4   prejudice actually existed such that petitioner's non-absolute-at-this-point, Sixth Amendment

5   right to counsel was properly denied.  Because the undersigned finds no federal constitutional

6   violation, it is not necessary to finally determine the very problematic harmless error rule applied

7   by the Court of Appeal to what is normally a structural error situation.[4]  This claim should be

8   denied.

9             C.   Sentencing Error: Claim 2, Supplemental Petition

10            Petitioner argues that the trial court violated the Equal Protection clause by

11  imposing consecutive sentences and by failing to state the reasons on the record for making the

12  sentences concurrent.  Respondent correctly argues that this claim is not exhausted.  However,

13  because this claim is without merit, it will be addressed.  28 U.S.C. § 2254(b)(2).

14            Petitioner contends that he was convicted of robbery in counts 1 and 2 and assault

15  in count 5.  The trial court stayed petitioner's sentence as to counts 3 and 4, but sentenced

16  petitioner consecutively as to counts 1, 2 and 5.  Petitioner argues that the trial court failed to

17  consider whether counts 1, 2 and 5 were committed on the same occasion or arose from the same

18  set of operative facts before imposing consecutive sentences.

19  \\\\\

20

21          [3] The Court of Appeal concluded that it could only speculate that another attorney, even
    the one who had been previously relieved, could not have been assigned to step in *that day* to put
22  on the defense.  The undersigned cannot agree.  It only takes a realistic understanding of being a
    trial attorney to know that no attorney could be expected to put on an effective defense without
23  having prepared for it, or that an attorneys' schedule would in all probability not permit the
    instant disruption which would be occasioned by a trial of some days.
24
            [4] Suffice it to say that it is not possible to take the facts as they came out at an
25  unrepresented trial, and assume that the attorney, if present, would not have added appreciably to
    the defense.  The denial of a right to counsel, absolute or not, is structural error.  See Robinson v.
26  Ignacio, 360 F.3d 1044, 1061 (9th Cir. 2004); Bell v. Hill, 190 F.3d 1089, 1091 (9th Cir. 1999).

1        "[I]t is not the province of a federal habeas court to reexamine state court

2  determinations on state law questions." <u>Estelle v. McGuire</u>, 502 U.S. at 67.  Habeas corpus relief

3  is unavailable for alleged errors in the interpretation or application of state sentencing laws by

4  either a state trial or appellate court, unless the error resulted in a complete miscarriage of justice.

5  <u>Hill v. United States</u>, 368 U.S. 24, 428 (1962); <u>Hendricks v. Zenon</u>, 993 F.2d 664, 674-75 (9th

6  Cir.1993).  So long as a state sentence "is not based on any proscribed federal grounds such as

7  being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties

8  for violation of state statutes are matters of state concern." <u>Makal v. State of Arizona</u>, 544 F.2d

9  1030, 1035 (9th Cir.1976). Thus, "[a]bsent a showing of fundamental unfairness, a state court's

10  misapplication of its own sentencing laws does not justify federal habeas relief." <u>Christian v.</u>

11  <u>Rhode</u>, 41 F.3d 461, 469 (9th Cir.1994).

12        In denying this claim, the Superior Court stated as follows:

13        Petitioner claims that the trial court did not properly exercise its discretion in
   selecting consecutive sentences instead of concurrent sentences.  However, he
14  does not attach any documentation or evidence to support his claim.  His only
   argument is that because the court did not state its reason(s) for imposing
15  consecutive sentences, it must not have known that it had the discretion to
   imposed [sic] consecutive sentences.  Nor does petitioner attach or refer to any
16  evidence outside the record.  Petitioner has not made a prima facie showing that
   the court abused its discretion in imposing consecutive sentences.

17

18  Respondent's Lodged Document 9.

19        Petitioner raised this claim again in a motion for reconsideration before the

20  Superior Court.  The claim was again denied:

21        Petitioner objects that the petition was not reviewed by his original sentencing
   judge, Judge Orr.  Judge Orr was unavailable to review the petition.  Petitioner
22  again requests that his sentences be ordered to run concurrently but does not add
   any additional facts or circumstances that would merits [sic] relief.  Specifically,
23  petitioner has not shown that he has been prejudiced by any claimed defect in
   sentencing since the failure to state reasons for consecutive sentencing was
24  harmless given the numerous circumstances in aggravation and the only
   circumstance in mitigation being petitioner's youthful age.  (See <u>People v.</u>
25  <u>Champion</u> (1995) 9 Cal.4th 879, 934.)  Therefore, petitioner has not stated any
   valid reason for reconsideration of the court's previous denial of the petition.
26  Respondent's Lodged Document 11.

1    For the reasons stated in the Superior Court opinions set forth above, the court

2    finds that petitioner's claim that the trial court erred in applying consecutive sentences in

3    violation of state law does not involve a violation of fundamental fairness.  Accordingly, this

4    claim is not cognizable in federal habeas and should be denied.[5]

5    D.   Denial of Motion for a New Trial: Claim 3, Supplemental Petition

6    Petitioner argues that the trial court erred by denying his motion for a new trial.

7    Respondent correctly argues that this claim is not exhausted.  However, because this claim is

8    without merit, it will be addressed.  28 U.S.C. § 2254(b)(2).

9    Respondent goes on to argue that the instant claim is procedurally barred because

10   the superior court denied it on procedural grounds.  A reviewing court need not invariably

11   resolve the question of procedural default prior to ruling on the merits of a claim where the issue

12   of procedural default turns on difficult questions of state law.  Lambrix v. Singletary, 520 U.S.

13   518, 524-25, 117 S.Ct. 1517 (1997); see also Busby v. Dretke, 359 F.3d 708, 720 (5th Cir. 2004).

14   Under the circumstances presented here, this court finds that petitioner's claim can be resolved

15   more easily by addressing it on the merits.

16   Petitioner argues that the trial court improperly denied his motion for a new trial

17   which was based on his claim of juror misconduct.  This court is aware of no clearly established

18   Supreme Court authority providing that a criminal defendant has a constitutional right to a new

19   trial.  On that ground, this claim should be denied.  Moreover, as will be discussed below,

20   petitioner's claim of juror misconduct was not (and is still not) well supported.  To the extent

21   petitioner states a cognizable claim, the trial court did not err in denying the new trial motion

22   because the motion was not well supported.

23   For the reasons discussed above, this claim is without merit and should be denied.

24   \\\\\

25

26   [5]  Petitioner does not claim, problematically, that he was entitled to a jury trial on the
     question of consecutive sentences.

1             E.   <u>Juror Misconduct: Claim 4, Supplemental Petition</u>

2             Petitioner argues that he was denied a fair trial because a juror deliberately failed

3 to disclose his prior knowledge of petitioner.  Respondent correctly argues that this claim is not

4 exhausted.  However, because this claim is without merit, it will be addressed.  28 U.S.C. §

5 2254(b)(2).

6             Respondent goes on to argue that the instant claim is procedurally barred because

7 the superior court denied it on procedural grounds.  A reviewing court need not invariably

8 resolve the question of procedural default prior to ruling on the merits of a claim where the issue

9 of procedural default turns on difficult questions of state law.  <u>Lambrix v. Singletary</u>, 520 U.S.

10 518, 524-25 (1997); <u>see</u> <u>also</u> <u>Busby v. Dretke</u>, 359 F.3d 708, 720 (5th Cir. 2004).  Under the

11 circumstances presented here, this court finds that petitioner's claim can be resolved more easily

12 by addressing it on the merits.

13             Petitioner argues that juror Miller failed to notify the court that he had knowledge

14 of prior bad acts by petitioner based on an incident during high school.  Petitioner argues that

15 during voir dire, prospective juror Sparrow told the court that she knew petitioner from high

16 school.  Petitioner dismissed juror Sparrow.  Petitioner argues that juror Miller was a teacher and

17 football coach at his high school at the time of the incident yet failed to bring this to the court's

18 attention.

19             The opinion of the Superior Court denying this claim sets forth more background

20 information:

21         A claim of jury misconduct may be cognizable on habeas corpus.  (See <u>e.g.</u>, <u>In re</u>

        <u>Hitchings</u> (1993) 6 Cal.4th 97 [intentionally concealing material information;

22         discussing the case during trial].)  A defendant must show that there was

        misconduct.  (<u>In re Carpenter</u> (1995) 9 Cal.4th 634, 657.)

23

24         Petitioner claims that there was jury misconduct in that one sitting juror knew

        petitioner from when petitioner was a high school student at Cordova High

25         School.  Petitioner suggests that the juror intentionally failed to disclose knowing

        petitioner, constituting misconduct.  Petitioner claims that the misconduct was

26         prejudicial because while he was a student at Cordova, he engaged in prior bad

        acts (assault with a firearm, etc.) which would have biased the juror since that

1  evidence was not admitted at trial.  Petitioner has not shown that misconduct
2  occurred. The attached exhibits suggest that the juror was a teacher at Cordova
   High School at the time that petitioner was a student there.  However, there is no
3  evidence that the juror knew petitioner, or of his prior bad acts.  It cannot be
   presumed that a teacher knows all students at the school where he teaches and
4  there is no evidence that petitioner was actually once of the juror's students.  Nor
   can it be presumed that a juror intentionally lied or failed to disclose material
5  information.  Although petitioner claims that the juror and a prospective
   (dismissed) juror discussed petitioner's prior bad act during jury selection,
6  petitioner attaches no evidence to support this allegation.  Therefore, petitioner
   has failed to show that the juror concealed any information, knew petitioner, or
7  was biased.

8  Respondent's Lodged Document 13.

9          While it is apparently undisputed that juror Miller taught at petitioner's high

10 school at the time petitioner attended the high school and committed his juvenile offense,

11 petitioner offers no evidence demonstrating that juror Miller knew petitioner or was aware of his

12 prior criminal history.  In order to obtain an evidentiary hearing as to this claim, petitioner must

13 provide more than his own unsupported assertions regarding juror Miller's knowledge of

14 petitioner and his criminal history.  See e.g., Phillips v. Woodford, 267 F.3d 966, 972 (9th Cir.

15 2001) (holding that an evidentiary hearing is not required when the petitioner relies solely upon

16 "conclusory, unsworn statements unsupported by any proof or offer of proof.").  Because

17 petitioner is not entitled to an evidentiary hearing, his claim of juror misconduct should be

18 denied.

19         F.  Ineffective Assistance of Counsel: Claims 6 and 7 Supplemental Petition

20         Petitioner argues that he received ineffective assistance from trial and appellate

21 counsel.  Respondent correctly argues that these claims are not exhausted.  However, because

22 these claims are without merit, they will be addressed.  28 U.S.C. § 2254(b)(2).

23         *Legal Standard*

24         A claim of ineffective assistance of appellate counsel utilizes the same Strickland

25 standard that is applied to trial counsel.  Smith v. Robbins, 528 U.S. 259, 287, 120 S. Ct. 746,

26 765 (2000).

34

1    The test for demonstrating ineffective assistance of counsel is set forth in

2    Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

3    that, considering all the circumstances, counsel's performance fell below an objective standard of

4    reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

5    identify the acts or omissions that are alleged not to have been the result of reasonable

6    professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

7    whether in light of all the circumstances, the identified acts or omissions were outside the wide

8    range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that

9    counsel's conduct was within the wide range of reasonable assistance, and that he exercised

10   acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

11   695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

12   Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

13   693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

14   counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

15   694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

16   confidence in the outcome."  Id., 104 S. Ct. at 2068.

17   In extraordinary cases, ineffective assistance of counsel claims are evaluated

18   based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct.

19   1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

20   *Analysis*: *Ineffective Assistance of Counsel*

21   Petitioner contends that he received ineffective assistance of counsel by the lawyer

22   appointed to represent him at sentencing.  Petitioner makes the following argument in the

23   supplemental petition in support of this claim:

24   Trial court judge Joseph A. Orr appointed Kenneth N. Brady to represent
     petitioner at his sentencing hearing only.  At which time, petitioner brought Mr.
25   Brady attention to several crucial assignments of error(s) that needed to be address
     at his sentencing; nor would he seek a continuance to prepare or investigate
26   petitioner's position, other than the fact that petitioner name on his adult case and

1   juvenile adjudication was different.  Petitioner, on his own, filed several motions
    that Mr. Brady refused to raise; yet the trial court also refuse to hear anything
2   outside of what Mr. Brady was prepared to argue.  Furthermore, Mr. Brady in his
    effort to do just the bear minimum in petitioner's case failed to preserve critical
3   assignments of error(s) at petitioner's sentencing; that counsel acting as a diligent,
    conscientious advocate would have foresaw and acted accordingly.  Sentencing
4   counsel's acts and omissions failed to protect petitioner 6th Amendment right as
    guarantee by the United States Constitution.

5

6   Supplemental Petition, pp. 11-12.

7           Petitioner's claim of ineffective assistance of counsel is vague and conclusory.

8   Petitioner does not allege what specific matters counsel failed to raise at sentencing.  Nor does

9   petitioner describe any motions that counsel should have made nor what matters counsel failed to

10  investigate.  Petitioner's reply to the answer does not contain any more information in support of

11  this claim.  Because this claim of ineffective assistance of counsel is vague and conclusory, it

12  should be denied.  Jones v. Gomez, 66 F.3d 199, 204-205 (9th Cir. 1995) (vague speculation or

13  mere conclusions unsupported by record are not sufficient to state claim.)

14          *Analysis:  Ineffective Assistance of Appellate Counsel*

15          Petitioner's ineffective assistance of appellate counsel is as follows:

16          As a result of petitioner being force to represent himself throughout his trial
            proceedings, he was in the unique position to provide appellate counsel with facts
17          about the case that was not contained within the transcripts.  To which petitioner
            did in the form of letter(s) and phone conversation. Yet, the record clearly
18          indicated a basis for argument by appellate counsel that the petitioner was
            inadequately represented at his sentencing.  In support of this argument was
19          sentencing counsel's failure to conduct adequate research and to present oral
            argument on several critical issues pertaining to petitioner's sentencing; only
20          electing to bring to the trial court's attention that petitioner name was different on
            his adult case and adjudication.  In the face of these triggering facts appellate
21          counsel should have been prepared to research and present all arguable issues on
            direct appeal generated from sentencing counsel inadequate representation.  In the
22          present case, the inexcusable failure of appellate counsel to raise crucial
            assignment of error(s), which arguable might have resulted in a lot less time,
23          deprived petitioner of effective assistance of appellate counsel to which he was
            constitutionally entitled.

24

25  Supplemental Petition, p. 13.

26  \\\\\

1    Petitioner's ineffective assistance of appellate counsel claim is just as vague and

2    conclusory as his ineffective assistance of counsel claim.  Petitioner cites no specific instances of

3    misconduct by his appellate counsel.  Accordingly, this claim should be denied as vague and

4    conclusory.

5    G.  Jury Instruction Error: Claim 9, Supplemental Petition

6    In claim 9, petitioner argues that the trial court committed reversible error by

7    failing to instruct the jury on the essential elements of the firearm enhancements.  As noted by

8    respondent, the firearm enhancement was reversed and remanded by the California Court of

9    Appeal on direct review.  Respondent's Lodged Document 4, p. 26.  The prosecution declined to

10   retry the firearm enhancement, and the trial court reduced petitioner's sentence.  For these

11   reasons, this claim should be denied.

12   H.  Cumulative Error: Claim 10, Supplemental Petition

13   Petitioner argues that he is entitled to habeas relief based on cumulative error.

14   Because the court finds no merit to petitioner's claims, his claim of cumulative error should be

15   denied.  Boyde v. Brown, 404 F.3d 1159, 1176 (9th Cir. 2005).

16   Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

17   a writ of habeas corpus be denied.

18   These findings and recommendations are submitted to the United States District

19   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

20   days after being served with these findings and recommendations, any party may file written

21   objections with the court and serve a copy on all parties.  Such a document should be captioned

22   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23   shall be served and filed within ten days after service of the objections.  The parties are advised

24   \\\\\

25   \\\\\

26   \\\\\

1 | that failure to file objections within the specified time may waive the right to appeal the District

2 | Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3 | DATED: 12/15/08

4 | /s/ Gregory G. Hollows

5 | UNITED STATES MAGISTRATE JUDGE

6 |

7 | johncharles.hab

8 |

38